# IN THE COURT OF APPEALS OF IOWA

No. 21-0583
Filed November 3, 2021

**IN THE INTEREST OF O.C.,**
**Minor Child,**

**M.C., Mother,**
       Appellant,

**D.C., Father**,
       Appellant.

_____

Appeal from the Iowa District Court for Polk County, Brent Pattison, District

Associate Judge.

A father and mother separately appeal the termination of their parental

rights to a child. **AFFIRMED ON BOTH APPEALS.**

Christine E. Branstad of Branstad & Olson Law Office, Des Moines, for

appellant mother.

Cole J. Mayer of Macro & Kozlowski, L.L.P, West Des Moines, for appellant

father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant

Attorney General, for appellee State.

Lynn Vogan of Youth Law Center, Des Moines, attorney and guardian ad

litem for minor child.

Considered by Bower, C.J., and Vaitheswaran and Schumacher, JJ.

**VAITHESWARAN, Judge.**

A father and mother separately appeal the termination of their parental rights to a child, born in 2017.  The father contends (1) the State failed to prove the grounds for termination cited by the district court; (2) the State failed to "provide[] appropriate reasonable efforts due to [his] intellectual disability under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act"; (3) termination was not in the child's best interests; and (4) the district court should have granted him a six-month extension.  The mother contends (1) the State failed to prove the grounds for termination cited by the district court; (2) the State failed to provide reasonable reunification efforts; (3) she should have been afforded a six-month extension to facilitate reunification; and (4) the termination order violated her equal protection and due process rights.  She also suggests termination was not in the child's best interests and the district court should have invoked an exception to termination based on the parent-child bond.

**I.      *Grounds for Termination, Reasonable Efforts—Father and Mother***

The district court terminated parental rights pursuant to several statutory grounds.  We may affirm if we find clear and convincing evidence to support any of the grounds.  *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).  We elect to focus on Iowa Code section 232.116(1)(h) (2020), which requires proof of several elements, including proof the child cannot be returned to parental custody.  That provision encompasses an obligation to make reasonable reunification efforts. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent.").  "Where it is inappropriate to return a child to the family

home, the legislature specified that 'reasonable efforts shall include the efforts made in a timely manner to finalize a permanency plan for the child.'" *In re L.T.*, 924 N.W.2d 521, 528 (Iowa 2019) (quoting Iowa Code § 232.102(10)(a)).

The State filed a child-in-need-of-assistance petition in 2018, based on concerns that the child "was underweight and . . . had a flat affect"; the mother "was allowing [the child] to be around individuals who [had] [f]ounded [c]hild [a]buse [a]ssessments for sex abuse"; and the parents' arrest "for possession of marijuana and carrying weapons" with the child in the car.[1] The district court found the child's "whereabouts [were] unknown" and it appeared the child was "being hidden by the parents and his safety [was] not assured." The court ordered the child removed from parental custody and filed a separate "pick up" order.

The child remained missing until 2019. He was eventually found in Colorado. The juvenile court in Colorado declined to exercise home state jurisdiction, and jurisdiction was established in Iowa. The Iowa Department of Human Services retrieved the child and placed him in foster care.

The district court adjudicated the child in need of assistance. The court found:

> Parents have been involved with [the departments of human services] in Iowa and Colorado since 2010 due to sexual abuse perpetrated on the children by Father and Mother's continued relationship with him. They were arrested together as recently as August 2019. Parents have been offered services and have either failed to comply and/or willfully attempted to evade involvement and services. When child was located in Colorado, the parents appeared to be living out of a vehicle. Foster parents in Colorado reported child

---

[1] The department of human services did not issue a confirmed child abuse assessment with respect to the underweight allegation because the primary health care provider was unable to verify the child's weight, and the mother failed to cooperate with the department.

did not recognize his name, did not know how to play with toys or playground equipment, and had attachment issues and night terrors.

Following a permanency hearing, the court found:

Placement outside the parental home is necessary because a return to the home would be contrary to the child's welfare due to a toxic combination of substance abuse, mental health problems, criminal justice involvement, and protective issues. The parents' lack of protective capacity is evidenced by the conditions the family was found in when the parents were arrested in Iowa and Colorado, the prior [department] cases in Iowa and Colorado, prior terminations, and two prior founded child abuse reports related to sexual abuse . . . as well as the lack of progress on any of these issues during the two years the case has been open.

The court addressed the parents' challenge to the State's reunification efforts as follows:

The parents both raised questions about the state's provision of reasonable efforts in the permanency hearing—requesting more visitation, help with housing, etc. The real problem in this case is that the parents have not cooperated with the services needed in the case until after the permanency hearing was set. In truth, they do not really believe any services are necessary and continue to simply re-litigate the original removal, adjudication, contempt proceeding, and any [department] requests that they address the reasons for removal in the first place. Even the lengthy child welfare proceedings in Colorado that led to termination of their parental rights to five other children are characterized simply as a result of corruption in Colorado.

Notwithstanding the parents' non-cooperation with the department, the court ordered the department to afford the father "any available housing assistance," as he requested. The court left visitation in the department's discretion, "[g]iven [the father's] absence from [the child's] life for such a long time" and the adverse effect of the mother's visits on the child, together with her prior decision to "abscond[] with the child from Iowa."

The case proceeded to termination. Following the termination hearing, the court found "clear and convincing evidence that [the child could not] be returned to [parental] custody at the time of the [termination] hearing." The court reasoned that the parents had not "meaningfully addressed the issues that led to removal—indeed, they [did] not think there ever was a basis for removal in the first place." The court cited the "many important findings to the contrary," including the child's "'stunted' development, the "dangerous conditions" in which he was found, and the parents' "unhealthy" "enmesh[ment] in each other's lives." While the court found the parents were "taking better care of themselves," the court was not convinced their progress showed they were "prepared to take care of [the child] two years after [the] case began." The court noted that a prior juvenile case was closed because the court believed the mother "could set boundaries with" the father, a belief that proved to be unfounded. The court declined to "make the same mistake" again, "especially when the parents [failed to] demonstrate[] any progress addressing the basic neglect [the child] experienced, as well as the way their relationship, substance use, and antagonism toward help . . . harmed him." On our de novo review, we find support for the court's findings.

The mother's therapist testified she advised the mother "that in order to have custody of this child and to provide a safe environment, she would have to exclude" the father. She did not "think that [was] something that [the mother] agree[d] with." When asked, "Is it still your belief that [the mother] does not believe [the father] is a threat to any of her children," she responded, "Yes."

As for the father, a department employee overseeing the case testified to "a history of sexual abuse, which is currently being denied," and the inability to

"address[]" it "when there's denial that the incident occurred." She acknowledged that the father's "issues may be more IQ related than mental health related," but pointed out that his condition came to light belatedly in light of the father's delayed engagement with services. The department employee testified,

> We have worked with his attorney and him and his providers throughout to understand his needs and what could help him accomplish his goals, and there were just a lot of delays and lapses and periods where he was not engaged. And so those services have always been present and recommended, just not necessarily taking advantage of by him until recently.

The department employee referred to "the pattern of concerns" seen with the family dating back ten years and the "continued dishonesty about several of the issues . . . that previously led to termination of rights on children." She noted that the parents' "relationship and/or contact with each other throughout the years [had] been unsafe." Specifically, the father was "a felon and should not have [had] access to firearms" and if the mother "was under the influence of marijuana that nullified her permit to carry." She also cited the parents "unsafe living arrangements" and stated, "After several years of services, you would expect these parents to be providing a more safe environment for this child." She recommended termination of parental rights, reasoning "the issues that brought this family to" the department's "attention continue[d] to be unresolved." We agree with the district court that the department made reasonable efforts to achieve the permanency plan and the child could not be returned to either parent's custody.

## II.    Best Interests—Father and Mother

Termination must be in the child's best interests. Iowa Code § 232.116(2). The district court made the following pertinent findings:

[The child] has been in one foster home for the entire length of this case. He has thrived in the care of these foster parents. He has gone from a child with limited affect, attachment deficits, and developmental delays to, in many ways, a typically developing three year old at the time of the termination hearing. He is resilient and secure enough now to participate in visitation with his mother without having night terrors or overeating during visits. The Court also relies on the [guardian ad litem's] recommendation for [termination of parental rights] in support of the best interests finding.

Making the finding that termination is in a child's best interest is always a hard one. The court believes fully that the parents love [the child] and ardently wish to be able to care for him again. The Court is also pleased that they have taken several important steps to care better for themselves late in the case. But [the child] deserves permanency after a nearly three year [child-in-need-of-assistance] journey. Their decisions early in the case—to deny any problems and opt out of meaningful services and engagement—put them so far behind that their "fourth quarter" efforts to "check the boxes" related to services were not successful. [The child] needs permanency in a family free from the kind of adjudicatory harm he experienced in his parents' care.

Suffice it to say that the record supports these findings.

### III.    *Additional Time—Father and Mother*

Both parents sought additional time to facilitate reunification. The district court denied the request, as follows:

Ultimately, this Court can only enter a six month extension if the court finds "the need for removal . . . will no longer exist at the end of the additional six month period." Iowa Code [§] 232.104(2)(b); *see also* [*id.* §] 232.117(5). The Court cannot make such a finding based on the record made in the hearing. [The parents] accept only the most limited kind of accountability for what has happened to [the child]. They do not agree that there is really any work for them to do to resume custody. While they have made progress in meeting their own basic needs since the permanency hearing, they continue to be in basic denial about the risks presented to [the child] by their current relationship, [the mother's] demonstrated inability to set boundaries with [the father], prior use of illegal substances, as well as their ongoing mental health issues—which have only been addressed in a superficial way since the permanency hearing. The length of time this case has been open weighs heavily in this Court's consideration of the extension request.

We agree with these findings. It is also worth noting that the parents effectively received additional time by virtue of postponements. As the department employee testified, "The permanency hearing was set for 20 months ago. The parents [received] several additional months just by way of continuances to show progress in their services, and we continue to see a lack of insight and/or meaningful progress in services as recently as last month." The district court appropriately denied the parents' request for additional time to facilitate reunification.

## IV.     *Exception to Termination—Mother*

As noted, the mother suggests that the district court should not have terminated her parental rights because she had "a connection that it would be detrimental to sever." Her argument implicates a permissive exception to termination. *See* Iowa Code § 232.116(3); *In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016). The district court found that neither parent raised an exception to termination. Nonetheless, the court addressed the exceptions and concluded "the child's age, length of time this case has been open, and [the child's] need for permanency" compelled termination.

On our de novo review, we agree with the mother that she shared a bond with the child. The department reported that she "engage[d] with [the child] throughout their time together and trie[d] to incorporate both fun and learning into their time together." At the same time, as noted by the district court, the department reported "night terrors" following visits and the child's "preoccup[ation] with food." Those behaviors dissipated with the transition to virtual visits during the COVID-19 pandemic. The department employee testified that, after "a decade of services," the mother was not in a position to safely parent the child. We

conclude the district court appropriately declined to invoke the permissive exception to termination based on the parent-child bond.

## V.   *Constitutional Issues—Mother*

The mother raises equal protection and due process challenges to the termination decision.  The district court addressed these challenges as follows:

> [T]he Court cannot conclude that [the mother's] constitutional rights were violated because [the mother] was treated differently from other parents, or treated in a fundamentally unfair way during the process. Iowa Code Chapter 232 has been deemed constitutional over and over again by appellate courts.  The "as applied challenge" fails as well.   [The mother] did not, as she alleges, do everything [the department] requested and more.  In fact, she resisted all efforts by [the department] to engage her in services until around the time of the Permanency hearing.  COVID 19 protocols for hearings for visits or hearings did not unfairly slow [her] progress—her progress was slowed by her own recalcitrance.  In fact, if they impacted the case in any way, COVID 19 protocols gave the parents additional time to engage in services.   Had the permanency hearing been accomplished in April as planned, there is little doubt a termination hearing would have been set around the same time as the ultimate permanency hearing.   The parents would not have had the opportunity to engage in the services they set up around the same time as the permanency hearing, and termination would have likely happened a long time ago.
> There are numerous other ways due process was provided. The Court's findings, which are required to be by clear and convincing evidence, satisfied due process requirements.   The Court's numerous continuances provided to [the mother] (when evidence was not available to her, or she wanted to represent herself, or she needed a delay to obtain new counsel) ensured fairness.  If anything, the Court probably erred in giving the parents too much time to prepare, and allowing [the mother] to further continue the [termination] hearing after the Court warned her (prior to representing herself) that no further continuances would be granted if she chose to obtain counsel.

(Citations omitted.)  We agree with the court's reasoning and affirm the denial of the mother's constitutional challenges to the termination proceeding.

We affirm the district court's decision to terminate parental rights.

**AFFIRMED ON BOTH APPEALS.**